**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| LBDS Holding Company, LLC, | |
| Plaintiff, | |
| v. | Civil Action No.  6:11-cv-428 |
| ISOL Technology Inc., Medivalley Inc., Lee Heung-kyu, Kim Yong-sik, Park Jeong-il, and Chang-Beom Ahn, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## ORIGINAL COMPLAINT

LBDS Holding Company, LLC ("LBDS") files this Original Complaint against ISOL Technology Inc., Medivalley Inc., Lee Heung-kyu, Kim Yong-sik, Park Jeong-il, and Chang-Beom Ahn.  LBDS alleges as follows:

### NATURE OF THE ACTION

1.     LBDS is developing highly confidential, proprietary technology that improves MRI imaging of the heart, a task that is difficult to perfect because of the motion of the heart. Despite spending years and millions of dollars developing its technology, LBDS has been prevented by defendants' misconduct from entering the market with a cardiac capable MRI system, while defendants are now marketing a cardiac MRI system using LBDS' proprietary technology.  Defendants previously manufactured only generic non-cardiac MRI systems that they marketed primarily in South Korea.  LBDS brings this lawsuit following its recent discovery of defendants' breaches of contract and misappropriation of trade secrets.  As described in more detail below, defendants agreed to, among other things, consult with LBDS and install LBDS' proprietary cardiac software within defendants' generic MRI systems which

1

would then be imported into the United States and be marketed by LBDS under LBDS' private label.  Not only did defendants fail to perform their contractual obligations, but they also misappropriated the LBDS software and technology for their own benefit, disclosed it without authorization, and ultimately sold it in their own MRI systems in competition with LBDS. Additionally, defendants are in discussions to sell LBDS' technology to Samsung Medison, a multi-national South Korean corporation.  LBDS is thus in imminent danger of immediate and irreparable damage if defendants continue to disclose, use or attempt to sell LBDS' technology. LBDS seeks damages and to protect its trade secrets from further disclosure and use by or for the benefit of any person or entity other than LBDS.

## PARTIES

2.      LBDS is a limited liability company organized under the laws of the State of Texas, and has its principal place of business at 120 E. FM 544, Suite 72, Murphy, Texas.  As described in more detail below, LBDS has developed highly confidential, proprietary technology relating to cardiac MRI imaging.

3.      ISOL Technology Inc. ("ISOL Technology") is a corporation organized under the laws of South Korea, and has its principal place of business at 203 Neung-Pyung Li, Opo-eup, Gwang-ju, Gyunggi-do, South Korea.

4.      Medivalley Inc. ("Medivalley") is a corporation organized under the laws of South Korea, and has its principal place of business at 203 Neung-Pyung Li, Opo-eup, Gwang-ju, Gyunggi-do, South Korea.  Medivalley is also known as ISOL Technology.  For purposes of this Original Complaint, LBDS refers to Medivalley and ISOL Technology as, collectively, "ISOL."  As described in more detail below, ISOL committed the wrongful conduct complained of herein, in whole or in part, in the State of Texas.

2

5.      Lee Heung-kyu ("Lee") is a citizen of South Korea and the Chief Executive Officer of ISOL.  Lee also sits on the Board of Directors of ISOL.  Lee's business address is 203 Neung-Pyung Li, Opo-eup, Gwang-ju, Gyunggi-do, South Korea.  Although Lee is a citizen of South Korea, he frequently travels to the United States and the State of Texas.  Lee maintains a home at 49 Chadwick, Irvine, California and, as described in more detail below, committed the wrongful conduct complained of herein, in whole or in part, in the State of Texas.  Lee travelled to LBDS' facilities in Texas in at least the years 2007, 2008, 2009, and 2011 in furtherance of the wrongful conduct complained of herein.

6.      Kim Yong-sik ("Kim") is a citizen of South Korea and the Vice Chief Technical Officer of ISOL.  Kim also sits on the Board of Directors of ISOL.  Kim's business address is 203 Neung-Pyung Li, Opo-eup, Gwang-ju, Gyunggi-do, South Korea.  Kim is responsible for the commercialization of technology in ISOL's products.  He provides support for all technical development between ISOL and any collaborative partners.  Kim coordinated the technology development for the MRI equipment displaying LBDS' technology during the Radiological Society of North America, Inc.'s 96th Scientific Assembly and Annual Meeting in Chicago, IL on November 28-December 2, 2010, as described in more detail below.

7.      Park Jeong-il ("Park") is a citizen of South Korea and the Chief Technical Officer of ISOL.  Park also sits on the Board of Directors of ISOL.  Park's business address is 203 Neung-Pyung Li, Opo-eup, Gwang-ju, Gyunggi-do, South Korea.  Although Park is a citizen of South Korea, he frequently travels to the United States and the State of Texas and, as described in more detail below, committed the wrongful conduct complained of herein, in whole or in part, in the State of Texas.  For example, Park travelled to LBDS' facilities in Texas in at least the year 2010, in furtherance of the wrongful conduct complained of herein.  Park is responsible for

all software development and implementation in ISOL's products.  He was responsible for software programming work that implemented the LBDS technology that is the subject of this Original Complaint in the ISOL MRI system.  Park is the only person at ISOL who could coordinate the implementation of LBDS' technology into the MRI equipment on display at the Radiological Society of North America, Inc.'s 96th Scientific Assembly and Annual Meeting in Chicago, IL on November 28-December 2, 2010, as described in more detail below.

8.     Chang-Beom Ahn ("Ahn") is a citizen of South Korea and a Professor with the Department of Electrical Engineering, Kwangwoon University, 447-1 Wolgye-dong, Nowon-gu, Seoul 139-701, South Korea.  Ahn was one of LBDS' consultants focused on the implementation of LBDS' technology in the ISOL MRI system.  For purposes of this Original Complaint, LBDS refers to ISOL, Lee, Kim, Park and Ahn as, collectively, the "Defendants."

## JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2).  There is complete diversity between the parties, as LBDS is a citizen of the State of Texas and Defendants are all citizens or subjects of South Korea, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.    This Court has personal jurisdiction over Defendants.  Defendants regularly conduct and transact business in the State of Texas, throughout the United States, and within the Eastern District of Texas.  ISOL, through Lee, contracted with LBDS within the State of Texas, and, more specifically, within the Eastern District of Texas.  Ahn contracted with LBDS within the State of Texas, and, more specifically, within the Eastern District of Texas.  In fact, the contract Ahn entered into with LBDS specifies that it is deemed entered into within the State of Texas.  The actions undertaken by Defendants that form the subject of this Original Complaint

4

occurred, in whole or in part, within the State of Texas.  Furthermore, LBDS has been damaged within the State of Texas, including within the Eastern District of Texas, and Defendants have at all relevant times known that LBDS is a Texas corporation with its principal place of business in the Eastern District of Texas and known that LBDS would suffer injury within the State of Texas and the Eastern District of Texas as a result of the conduct complained of herein.

11.     Venue is proper in the Eastern District of Texas, at a minimum, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to this lawsuit occurred in the Eastern District of Texas and/or because Defendants are subject to personal jurisdiction in the Eastern District of Texas.  Venue is also proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(d), as Defendants are aliens.

<u>FACTS</u>

12.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

A.     **LBDS And Its Proprietary Technology**

13.     Founded in 2007, LBDS has developed highly confidential and proprietary technology and know-how relating to magnetic resonance imaging ("MRI") (the "Proprietary Technology").

14.     LBDS' Proprietary Technology relates more specifically to highly confidential, proprietary hardware and software technology relating to MRI systems enabling cardiac MRI imagining of a patient.  This is a capability Defendants did not have prior to October 2008.  Besides LBDS, only General Electric, Philips, Siemens, and Toshiba have the capability to provide cardiac MRI imaging.

15.     LBDS' Proprietary Technology also enables imaging of the vascular system of a

patient with MRI systems.  This is a capability Defendants did not have prior to October 2008.  Besides LBDS, only General Electric, Philips, Siemens, and Toshiba have the capability to provide vascular MRI imaging.

16.     LBDS' Proprietary Technology employs, among other things, unique, highly confidential and proprietary methodologies.

17.     LBDS' Proprietary Technology also includes unique, confidential know-how relating to developing the hardware found within a general purpose MRI system to become capable of performing cardiac MRI imagining.

18.     LBDS is the owner of all rights, title and interest to the Proprietary Technology.

19.     LBDS has at all times taken measures to keep its Proprietary Technology confidential and prevent it from becoming available to persons other than those selected by LBDS to have access to the Proprietary Technology for limited purposes.  LBDS employs measures such as confidentiality agreements, site access controls, password protection and the use of confidentiality labels in connection with its Proprietary Technology.

**B.      ISOL And ISOL's MRI System**

20.     Prior to October 2008 when LBDS established its relationship with ISOL, ISOL's MRI system included a general operating system that provided general body imaging, but it had no cardiac capability.  In other words, the ISOL MRI system's hardware and software could not support basic cardiac MRI imaging.  Nor has ISOL ever developed the capability to image the heart, without the use of LBDS' Proprietary Technology.

**C.      The Technology Services And Product Supply Agreement**

21.     On or about October 16, 2008, LBDS and ISOL entered into the Technology Service and Product Supply Agreement (the "Agreement").

6

22.     The Agreement contemplated LBDS purchasing certain products from ISOL, such as (i) a 1st Used 1.5 MRI System (including console, amplifiers, RF Coils, etc.); (ii) New 1.5T MRI Systems (including consoles, amplifiers, RF Coils, etc.); (iii) Consoles (purchased individually), including spectrometers, servers and graphical user interface systems; (iv) RF coils (purchased individually); and (v) patient beds, MRI system covers, penetration panels, cables, and spare parts.

23.     The Agreement also contemplated that ISOL would provide LBDS with certain services such as (i) providing all required documentation and any new test reports required for LBDS to use in receiving FDA clearance for the console; (ii) acting as a systems integrator for a wide bore magnet system; (iii) providing LBDS the MRI engineering support, including integration, RF coils, trouble shooting, service, training, etc.; (iv) developing for LBDS a dedicated cardiac and peripheral vascular coil; (v) performing an integration project with improved ISOL console for two different models of a specified OEM MRI systems manufacturer and two different models of a second specified OEM MRI systems manufacturer (which could entail stripping the systems and replacing critical parts such as RF coils, amplifiers, etc.).

24.     Section 7.1 of the Agreement sets forth the standard of care that ISOL must meet under the Agreement.  Section 7.1 reads:

> **Technology Services Standard of Care.**  ISOL shall provide the Technology Services to LBDS (a) in accordance with all of the terms of this Agreement, including, without limitation, the terms set forth on Schedule A, (b) with a high degree of skill and care, in a manner that is considered to be excellent in the industry and without any negligence or willful misconduct, and (c) in the same manner and consistent with past practice and ISOL's standard operating procedure, and with the same degree of care and skill as it uses (or has in the past used) in performing the same or similar services on its own behalf.  ISOL shall at all times during the term of this Agreement use reasonable efforts to comply with all reasonable directions from LBDS related to the Technology

Services.  ISOL shall not take any action under this Agreement that is likely to result in a liability or obligations being imposed upon LBDS unless so directed by LBDS.

25.     Article 11 of the Agreement contains a strict confidentiality provision, which prohibits ISOL from, among other things, using or appropriating LBDS' Proprietary Technology for its own benefit or the benefit of any third party.  Article 11 reads:

> **CONFIDENTIALITY.**  Each party agrees that during and after the term of this Agreement it shall keep confidential and not directly or indirectly divulge to anyone (except to its employees who have a need to know in connection with the performance of this Agreement) nor use (except in connection with the performance of this Agreement) or otherwise appropriate for its own benefit or for the benefit of any other person or entity, any confidential information or documents of or relating to the other, including, without limitation, confidential records, client and customer lists and sales, profit and income data (collectively, "Confidential Data"), unless and to the extent such disclosure is required by law.  Information shall be deemed to not be Confidential Data if it is shown by the receiving party to be in the public domain (not as a result of disclosure by the receiving party or due to a breach of confidentiality by a third party); known by the receiving party prior to disclosure and not otherwise subject to a duty of confidentiality; or properly provided to the receiving party on a non-confidential basis by a third party, or independently developed by the receiving party. This Section 10 [sic] shall survive the expiration or termination of this Agreement.

(emphasis added).

26.     LBDS has complied with and performed all contractual requirements under the Agreement.

**D.     Ahn And The Consulting Agreement**

27.     LBDS engaged a number of internationally recognized consultants, including Ahn, to define and direct the ISOL MRI hardware and software development.  On or about December 18, 2008, LBDS and Ahn entered into a consulting agreement (the "Consulting Agreement").  In exchange for monetary consideration, the Consulting Agreement required Ahn

to perform certain services for LBDS, including "interacting with LBDS technical team to oversee implementation of LBDS projects by ISOL engineers by providing them with guidance and advice."

28.     Section 3 of the Consulting Agreement contains a strict confidentiality provision. It reads:

> **Section 3.   Confidentiality.**   At all times during the term of this Agreement and thereafter, <u>Consultant</u> [i.e., Ahn] <u>shall</u> <u>hold</u> <u>all</u> <u>Proprietary</u> <u>Material</u> <u>and</u> <u>Non-party</u> <u>Material</u> <u>in</u> <u>strictest</u> <u>trust</u> <u>and</u> <u>confidence</u> <u>and</u> <u>shall</u> <u>neither</u> <u>disclose</u> (to anyone other than Company [i.e. LBDS] personnel having a need to know such Material in connection with their activities for Company) <u>nor</u> <u>use</u> (except insofar as required by Consultant's services for Company under this Agreement) <u>any</u> <u>Proprietary</u> <u>Material</u> <u>or</u> <u>any</u> <u>Non-party</u> <u>Material</u>, unless: (a) Consultant is expressly authorized in writing to the contrary by an authorized officer of Company; (b) absent breach or violation of this Agreement, such Material is or becomes generally known to the public or available to the public, as evidenced by a printed publication or other equally conclusive evidence; (c) absent breach or violation of this Agreement, such Material is rightfully received absent confidentiality obligation by Consultant from a non-party outside of Company, as evidenced by a dated and witnessed writing prepared in the normal course of business or other equally conclusive evidence; or (d) required to the contrary by operation of law.

(emphasis added).

29.     The Consulting Agreement defines "Proprietary Material" as including, among other things, any information that is of value to LBDS, as well as all materials relating to confidential information created, conceived, or discovered by Ahn during the course of the Consulting Agreement.

30.     Section 1.1 of the Consulting Agreement requires Ahn to use "best efforts" when performing his work under the Consulting Agreement.  It reads in relevant part:  "During the term of this [Consulting] Agreement, [Ahn] agrees to perform services for [LBDS] under this

[Consulting] Agreement, but only to the extent requested by [LBDS].  [Ahn] will undertake the performance of the work on a 'best efforts' basis."

31.     Section 7.5 of the Consulting Agreement requires Ahn to perform his work in, among other things, a "professional and workmanlike manner" and "with due diligence and in full compliance with professional standards of practice."  It reads in relevant part:  "[Ahn's] performance under this [Consulting] Agreement shall be conducted conscientiously in a professional and workmanlike manner and to the full limit of [Ahn's] talents and capabilities with due diligence and in full compliance with professional standards of practice in the industry. [Ahn] shall comply with all applicable laws in the course of performing activities under this [Consulting] Agreement."

32.     LBDS has complied with and performed all contractual requirements under the Consulting Agreement.

**E.      In Reliance On The Consulting Agreement's And The Agreement's Strict Confidentiality Provisions, LBDS Disclosed Its Proprietary Technology To Defendants**

33.     Pursuant to the Consulting Agreement's confidentiality provision, LBDS disclosed its Proprietary Technology to Ahn.  For example, Ahn was involved in the implementation of LBDS' Proprietary Technology within the ISOL MRI system on a routine basis, including during many on-site meetings at ISOL's facility in South Korea.  Through these implementation efforts, LBDS' Proprietary Technology was made known to Ahn.

34.     Pursuant to the Agreement, and in reliance on the Agreement's strict confidentiality provision, LBDS disclosed its Proprietary Technology to ISOL so that it could integrate the Proprietary Technology into the MRI systems to be purchased by LBDS.

35.     For example, LBDS provided the Proprietary Technology to the ISOL in the form of plug-in modules in March and April 2009, and in November 2009.  Software code was

10

provided by LBDS to ISOL to enable the implementation of the LBDS Technology in the ISOL MRI system.  The plug-in-modules implemented rapid scanning and improved resolution capabilities in the ISOL MRI system.  The plug-in-modules and software code were LBDS' Proprietary Technology.

36.     Under the direction of LBDS, Defendants developed, implemented and refined the ISOL MRI system to support cardiac MRI.  ISOL implemented the LBDS proprietary MRI software code in the form of cardiac pulse sequences and other MRI software code that were developed by LBDS for use in the ISOL MRI systems.  The ISOL MRI system with LBDS' embedded technology was to be sold by ISOL to LBDS per the terms of the Agreement.

37.     Additionally, pursuant to the Agreement and in reliance on the Agreement's strict confidentiality provision, LBDS employees traveled to ISOL in South Korea in December 2008, April 2009, June 2009, and November 2009 and explained LBDS' Proprietary Technology in detail with ISOL employees including Park, Kim, Lee and others.  Experiments were performed while LBDS employees were on-site at the ISOL facility to test the implementation of LBDS' Proprietary Technology.

**F.     ISOL Fails To Perform As Required Under Section 7.1 Of The Agreement**

38.     After LBDS and ISOL entered into the Agreement, ISOL failed to perform under the standard of care required under Section 7.1 of the Agreement.

39.     For example, ISOL failed to complete the initial project for LBDS, which was to integrate LBDS' Proprietary Technology into the ISOL MRI system, thereby achieving cardiac imaging capability.

40.     ISOL similarly failed to complete any of the services and/or work listed on Schedule A of the Agreement.

41.     ISOL, as described herein, also engaged in willful misconduct.

11

42.     ISOL's failure to comply with Section 7.1 of the Agreement constituted a material breach of contract, prevented LBDS from completing any successful customer demonstrations, and prevented LBDS from purchasing any of the new MRI systems listed on Schedule C of the Agreement for delivery to customers.

### G.     After Entering Into The Consulting Agreement And The Agreement, Defendants Misappropriate LBDS' Proprietary Technology

43.     After entering into the Consulting Agreement and the Agreement, Defendants (including Ahn, who has been and is working in concert with the other Defendants to, among other things, develop a competing MRI system using LBDS' Proprietary Technology), without LBDS' authorization or consent, misappropriated LBDS' Proprietary Technology to enable ISOL's general purpose MRI to perform cardiac MRI imagining.  The ISOL MRI system's cardiac capability was achieved using LBDS' Proprietary Technology.

44.     Defendants similarly misappropriated LBDS' Proprietary Technology by implementing, without LBDS' authorization or consent, LBDS' own business plan.  LBDS' business plan called for the retrofitting of existing MRI systems by embedding such MRI systems with LBDS' Proprietary Technology, thereby allowing cardiac imaging to be performed. Defendants have retrofitted, without LBDS' authorization or consent, existing MRI systems with LBDS' Proprietary Technology, allowing Defendants to sell MRI systems with cardiac imaging capability.

45.     LBDS never authorized Defendants to use LBDS' Proprietary Technology for their own benefit or the benefit of any other person or entity; Defendants to present LBDS' Proprietary Technology as their own technology; or Defendants to sell any MRI systems containing LBDS' Proprietary Technology.

**H.      RSNA 2010:   LBDS Discovers ISOL's Breach Of Article 11 Of The Agreement And The Misappropriation Of LBDS' Proprietary Technology**

46.      In late November 2010, LBDS' Chief Executive Officer ("CEO") and LBDS' Chief Operating Officer ("COO") travelled to Chicago, Illinois to attend the Radiological Society of North America, Inc.'s ("RSNA") 96th Scientific Assembly and Annual Meeting.

47.      The RSNA is a non-profit professional membership society dedicated to excellence in patient care through education and research.  The RSNA has over 46,000 members in 125 countries.   RSNA's members include radiologists, radiation oncologists, medical physicists and allied scientists.  RSNA hosts the world's largest annual medical meeting, which typically starts the last Sunday of November and is held in Chicago, Illinois.  The 2010 RSNA Technical Exhibition represented the single most important radiology gathering in the United States, if not the world.

48.      LBDS' CEO and COO attended the 2010 RSNA Technical Exhibition to, among other things, demonstrate LBDS' Proprietary Technology at a booth of one of LBDS' distribution partners.  LBDS' distribution partner is a large, publicly traded corporation, and is a leading supplier of health care information technology solutions, healthcare devices and related services.

49.      On November 29, 2010, LBDS' CEO and COO happened upon the booth of Medison, a potential competitor of LBDS.  Medison is one of South Korea's leading makers of medical equipment, including MRI systems, and has recently been acquired by Samsung.  Lee and Park, along with three of ISOL's engineers, were stationed in Medison's booth.  Also present in Medison's booth were representatives of Medison.

50.      The Medison trade show booth included a display of LBDS' Proprietary Technology, which was created without authorization from LBDS.  For example, the booth

contained a sign advertising cardiac imaging that listed specific LBDS Proprietary Technology relating to cardiac technologies.  The booth also had a PowerPoint slide show that displayed specific LBDS Proprietary Technology descriptions.  The MRI computer console in the booth displayed cardiac images that had been created using LBDS' Proprietary Technology.

51.     LBDS' CEO and COO confronted Lee and Park at the trade show about the unauthorized use and disclosure of LBDS' Proprietary Technology.  LBDS' CEO and COO were told, falsely, that ISOL displayed LBDS' Proprietary Technology in Medison's booth because they did not think that LBDS would mind.

52.     Later, on December 21, 2010, LBDS' COO had a telephone conference with Lee and asked Lee why ISOL used LBDS' Proprietary Technology at Medison's booth without notifying LBDS and without LBDS' permission.  LBDS' COO also requested that Lee disclose ISOL's relationship with Medison.

53.     During the December 21 telephone conference, Lee again admitted that ISOL had showcased LBDS' Proprietary Technology at RSNA, including by displaying it on a screen in Medison's booth, all without LBDS' permission.  Lee further admitted that (i) ISOL used LBDS' Proprietary Technology to help with Medison's MRI sales and to demonstrate better image quality; (ii) ISOL used LBDS' cardiac analysis system software and demonstrated LBDS' cardiac imaging capability without LBDS' permission; (iii) the Proprietary Technology was LBDS' property; (iv) ISOL does not and did not have any right to LBDS' Proprietary Technology; (v) Medison did not have the expertise to demonstrate capabilities similar to LBDS' Proprietary Technology capabilities; (vi) ISOL and Medison had recently entered into a contractual agreement, whereby Medison would sell ISOL's MRI system on a "unit by unit" basis (Lee refused to provide LBDS with a copy of the ISOL-Medison agreement); (vii) LBDS

14

was not listed on any of the materials on display in Medison's booth; (viii) ISOL and Medison displayed slides showcasing LBDS' Proprietary Technology; (ix) ISOL prepared the presentation and the slides that were displayed by Medison; (x) Medison has no expertise vis-à-vis MRI systems; and (xi) Medison did not have a license from LBDS or permission from LBDS to display or use LBDS' Proprietary Technology.

I.     **Following RSNA 2010, Defendants Continued To Improperly Use And Disclose LBDS' Proprietary Technology**

54.     In or around December 2010, Ahn presented a talk entitled "Four-Dimensional Cardiac Imaging in a Single Breath Hold" at the 1st CMC-UCI Joint Symposium on Biomedical Imaging during a session called "4-Dimensional Cardiac MR Technology" and in which Ahn and Lee were the only two presenters.   In his presentation, Ahn stated that the use of "[c]ompressed sensing is a technique to find a solution with far less data in k-t space than conventional Nyquist rate."   This presentation by Ahn discloses, without authorization, one of LBDS' Proprietary Technologies that achieves four dimensional cardiac imaging in a single breath hold and constitutes a violation of his Consulting Agreement with LBDS.   This LBDS Technology was disclosed to Ahn pursuant to the Consulting Agreement, and Ahn's disclosure of it to third parties was not authorized by LBDS.

55.     In or around April 2011, Ahn published a journal article referencing a sparse k-space sampling methodology that results in faster scan times.   This was an unauthorized disclosure of another one of LBDS' Proprietary Technologies—which was disclosed to Ahn pursuant to the terms of the Consulting Agreement—and also constitutes a violation the Consulting Agreement.   In this same article, Ahn also references conducting this work with ISOL and ISOL's CHORUS MRI system.

56.     In or around April 2011, Lee made a Technology Strategy Research presentation

15

at the Science and Technology Policy Institute of South Korea.  In the presentation, Lee presents the following: (i) Cardiac 1.5T MRI (2009-2010) and references a new ISOL cardiac MRI system: 1.5T MRI Chorus-CX; (ii) Cardiac MRI development; and (iii) Version 2 spectrometer with "[p]recise timing accuracy using advanced FPGA."  These MRI system improvements were completed under the direction of LBDS as a prerequisite to achieve cardiac MRI.  The ISOL accumulated technologies listed in the presentation includes the following technologies: Angiography, Cardiac Imaging, and Ultra Fast Scan.  This presentation, done without authorization of LBDS, constitutes a violation of the Agreement, as it discloses LBDS' Proprietary Technology without LBDS' authorization.

57.     On July 5, 2011, while in Texas meeting with LBDS' CEO and COO, Lee falsely stated that ISOL "forgot the Cardiac MRI idea" after RSNA; that ISOL had performed no further cardiac development work; that ISOL "had not done anything with cardiac"; and that Ahn was only working on MRI angiography with ISOL, not high speed MRI.

58.     Lee eventually admitted that ISOL had sold an ISOL MRI retrofit system in 2011 to a South Korean customer that contained a computer console with LBDS' Proprietary Technology.  This sale was made without LBDS' knowledge, authorization or consent.

59.     Lee further admitted that ISOL was using LBDS' retrofit business model in South Korea.

60.     Defendants' actions demonstrate a pattern of misappropriation and theft of LBDS' Technology, including both the LBDS cardiac hardware and software technology that is necessary to perform cardiac MRI imaging, as well as LBDS cardiac technology that is necessary to achieve significant improvements to the current cardiac MRI capability in the market.  Defendants are actively working in concert with one another to develop and market

cardiac MRI systems using the Proprietary Technology they misappropriated from LBDS.

61.     LBDS' CEO advised Lee during the July 5, 2011 meeting that, as a result of Defendants' wrongful conduct, LBDS intended to file the instant lawsuit.

62.     On July 29, 2011, LBDS' CEO contacted Jo Jae Moon, Head of Research and Development at Samsung Medison of South Korea, and confirmed that Samsung Medison is in contact with ISOL regarding the acquisition of MRI technology.  Moon declined an offer by the CEO to review LBDS' MRI technology.

63.     LBDS has complied with any and all conditions precedent prior to bringing this lawsuit.

### COUNT ONE
### (BREACH OF CONTRACT — BREACH OF THE AGREEMENT, SECTION 7.1)

64.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

65.     The Agreement constitutes a valid contract between LBDS and ISOL.

66.     LBDS performed at all times as required under the Agreement.

67.     ISOL materially breached the Agreement by, at a minimum, failing to meet the standard of care set forth in Section 7.1 of the Agreement.  For example, ISOL failed to perform any of the services set forth in Schedule A of the Agreement, and engaged in willful misconduct.

68.     LBDS suffered damages as a result of ISOL's breach of the Agreement.

### COUNT TWO
### (BREACH OF CONTRACT — BREACH OF THE AGREEMENT, ARTICLE 11)

69.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

70.     The Agreement constitutes a valid contract between LBDS and ISOL.

71.     LBDS performed at all times as required under the Agreement.

17

72.     ISOL materially breached the Agreement by, at a minimum, failing to comply with the Agreement's confidentiality provision as set forth in Article 11 of the Agreement.  For example, ISOL used and disclosed LBDS' Proprietary Technology for its own benefit and in an unauthorized manner.

73.     LBDS suffered damages as a result of ISOL's breach of the Agreement.

## COUNT THREE
### (BREACH OF CONTRACT — BREACH OF THE CONSULTING AGREEMENT)

74.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

75.     The Consulting Agreement constitutes a valid contract between LBDS and Ahn.

76.     LBDS performed at all times as required under the Consulting Agreement.

77.     Ahn materially breached the Consulting Agreement by, at a minimum, failing to comply with the confidentiality provision contained in Section 3 of the Consulting Agreement, by failing to comply with Section 1.1's "best efforts" provision, and by failing to comply with Section 7.5's "professional and workmanlike manner" provision.  For example, Ahn used and disclosed LBDS' Proprietary Technology for his own benefit and in an unauthorized manner, thereby breaching such provisions.

78.     LBDS suffered damages as a result of Ahn's breach of the Consulting Agreement.

## COUNT FOUR
### (TRADE SECRET MISAPPROPRIATION)

79.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

80.     LBDS' Proprietary Technology constitutes a trade secret or trade secrets, as it consists of a formula, pattern, device or compilation of information used in LBDS' business, which gives LBDS an opportunity to obtain an advantage over its competitors who do not know

18

or use it.  LBDS' Proprietary Technology similarly constitutes technical information, design, process, procedure, formula, or improvement that has value.  LBDS' Proprietary Technology was at all times kept confidential by LBDS.

81.     Defendants breached a confidential relationship and/or improperly discovered LBDS' Proprietary Technology.

82.     Defendants used and disclosed LBDS' Proprietary Technology in an unauthorized manner.

83.     Defendants are attempting to sell LBDS' Proprietary Technology in an unauthorized manner by representing it as their own.

84.     LBDS has suffered damages as a result of Defendants' conduct and is in imminent danger of immediate and irreparable damage if Defendants continue to disclose, use or attempt to sell LBDS' Proprietary Technology.

## COUNT FIVE
### (CIVIL CONSPIRACY)

85.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

86.     Each Defendant entered into an agreement with one another to misappropriate LBDS' Proprietary Technology.

87.     A meeting of the minds on the object of Defendants' agreement or course of action existed.

88.     Pursuant to this agreement, Defendants committed one or more unlawful, overt acts.

89.     Defendants specifically intended to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means.

McKool 396182v1

90.     Defendants were aware of the harm or wrongful conduct at the inception of their agreement.

91.     LBDS has been damaged as a result of Defendants' unlawful, overt acts.

### COUNT SIX
### (COMMON LAW UNFAIR COMPETITION / MISAPPROPRIATION)

92.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

93.     LBDS' Proprietary Technology was created through extensive time, labor, skill, and money.

94.     Defendants used LBDS' Proprietary Technology in competition with LBDS, thereby gaining a special advantage in that competition because Defendants were burdened with little or none of the expense incurred by LBDS.

95.     LBDS suffered commercial damages as a result of Defendants' conduct.

### COUNT SEVEN
### (THEFT, V.T.C.A., CIVIL PRACTICE & REMEDIES CODE § 134.003)

96.     LBDS incorporates the foregoing paragraphs by reference as if fully set forth herein.

97.     The Proprietary Technology constituted LBDS' trade secrets.

98.     Defendants unlawfully appropriated the Proprietary Technology with the intent to deprive LBDS of the Proprietary Technology and without LBDS' consent.

99.     LBDS has sustained damages as a result of Defendants' theft of the Proprietary Technology.

### JURY DEMAND

100.    LBDS hereby demands a trial by jury on all issues so triable.

## <u>PRAYER FOR RELIEF</u>

LBDS requests that the Court enter judgment in its favor as follows:

A.     Enter an injunction:

(i)     prohibiting Defendants, and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from disclosing, using or selling LBDS' Proprietary Technology for the benefit of any person or entity;

(ii)    prohibiting Defendants, and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from disclosing, using, or selling LBDS' proprietary retrofit business model;

(iii)   requiring Defendants, and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, to return LBDS' Proprietary Technology to LBDS and to deliver to LBDS all records and data of any kind (whether paper, electronic, audio, visual or otherwise) which constitute or reflect, in whole or in part, proprietary business information, trade secrets, or other confidential information of LBDS;

(iv)    requiring Defendants, and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those

in active concert or participation with any of them, to disclose the identities of any person or entity to whom Defendants have disclosed LBDS' Proprietary Technology to, and require Defendants to provide a full account of any such disclosure;

(v)    requiring Defendants to file with this Court and serve on LBDS' counsel, within fifteen days after service of the injunction on Defendants, a report in writing and under oath setting forth in detail the manner in which Defendants have complied with the injunction; and

(vi)    accounting for sales.

B.    Awarding actual damages to LBDS, which total an amount in excess of $75,000;

C.    Ordering Defendants to disgorge any monies, gains, profits, and/or advantages that are attributable to the use of LBDS' Proprietary Technology or any of the acts complained of herein;

D.    Awarding LBDS punitive, exemplary damages, and/or treble damages;

E.    Awarding LBDS its attorney's fees;

F.    Awarding LBDS its costs of court;

G.    Awarding LBDS prejudgment and post-judgment interest at the highest rate allowed by law on the damages awarded; and

H.    Granting LBDS such other and further relief as the Court may deem just and equitable.

DATED:  August 16, 2011

Respectfully submitted,

By: /s/ Theodore Stevenson, III

Theodore Stevenson, III, Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
Steven Callahan
Texas State Bar No. 24053122
scallahan@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
McKool Smith, P.C.
104 East Houston, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

*Counsel for LBDS Holding Company, LLC*