IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| LBDS HOLDING COMPANY, LLC | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 6:11-cv-00428-LED |
| | § | |
| v. | § | |
| | § | |
| ISOL TECHNOLOGY INC., MEDIVALLEY | § | |
| INC., and HEUNG-KYU LEE | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' EMERGENCY MOTION FOR SANCTIONS

Defendants ISOL Technology Inc., Medivalley Inc. (collectively, "ISOL"), and Dr. Heung-Kyu Lee (collectively, "Defendants") file this Emergency Motion for Sanctions based on Plaintiff LBDS Holding Company's ("LBDS's") use of manufactured and forged documents throughout this lawsuit and on the corresponding perjury of LBDS's members Albert Davis and David Hernon.  The only appropriate civil sanction for LBDS's egregious, bad-faith conduct is setting aside the Verdict, dismissing LBDS's claims with prejudice, and ordering LBDS to pay Defendants' attorneys' fees incurred in this frivolous lawsuit.

## I.
## Background

**A.    ISOL's post-verdict investigation revealed that LBDS manufactured and forged documents to defraud ISOL during the parties' MRI project.**

On May 2, 2014, the undersigned lead counsel received a voicemail from an anonymous caller advising him that he needed to speak with the Federal Bureau of Investigation regarding the Verdict (Doc. No. 168) awarding more than $25,000,000 to LBDS.  On May 5, 2014, the undersigned lead counsel contacted the Federal Bureau of Investigation, which referred him to the Computer Crimes Unit of the United States Attorney's Office for the Western District of

Missouri.   The undersigned counsel was then referred to corporate counsel for Cerner Corporation.   These discussions led to an eventual discovery that LBDS manufactured and forged documents to defraud ISOL during the LBDS-ISOL MRI project and that LBDS produced and used these documents as its primary evidence during this lawsuit.   On May 12, 2014, the United States Attorney's Office served the undersigned law firm with a subpoena *duces tecum* for copies of Mr. Davis's and Mr. Hernon's testimony, trial transcripts, and trial exhibits.[1]

**B.     LBDS manufactured purported e-mails from Cerner Corporation.**

Sometime prior to March 2, 2010, LBDS or its members registered the @cernerinc.com domain and sent e-mails purporting to be from Cerner Corporation using that domain.[2]   On March 2, 2010, Mr. Hernon forwarded one such e-mail to ISOL.[3]   The underlying e-mail was purportedly from Bill Gish, the Director of Business Development for Cerner Corporation, who wrote that Cerner Corporation was still committed to the minimum purchase requirements under its agreement with Chase Medical, L.P./Phi Health, L.P. ("Chase Medical/Phi")[4] but that Cerner Corporation needed to schedule customer site visits to the LBDS-ISOL demonstration MRI system in order to proceed under that agreement.[5]

Attached are affidavits from employees of Cerner Corporation, including Mr. Gish, proving that Mr. Gish never sent this e-mail and that he never used the bill.gish@cernerinc.com

---

[1] Subpoena, Ex. A
[2] *See* Aff. of Bill Gish, Ex. B; Aff. of Lance Yoder, Ex. C; Aff. of Mark Bruno, Ex. D.
[3] Exs. B, D.
[4] The disconcerting relationship between LBDS and Chase Medical/Phi is explained in ISOL's Renewed Motion for Judgment as a Matter of Law, and Alternatively, Motion for New Trial (Doc. No. 177).   In sum, Chase Medical/Phi created LBDS as a broker to locate a partner, like ISOL, that could integrate Chase Medical/Phi's software into a 1.5T MRI system to create a dedicated cardiac MRI system.   The four members of LBDS – Albert Davis, David Hernon, David Tayce, and Suresh Reddy/Suresh Mitta/Mitta Suresh – are all limited partners of Chase Medical/Phi.   Although Mr. Davis testified at trial that he had to wind up Chase Medical/Phi after the LBDS-ISOL MRI project, the members of LBDS continue to do business as "Chase Medical" through the domestic entities KDL Medical, Inc. and Heart Failure Technologies, LLC.   *See* Sec. of State Filings for KDL Medical, Ex. L; Sec. of State Filings for Heart Failure Technologies; Ex. BBB.
[5] Exs. B, D.

e-mail address.[6]  The affidavit of Mark Bruno with Cerner Corporation reveals that LBDS's or

its members' use of the @cernerinc.com domain was not limited to LBDS's communications

with ISOL.[7]  It appears that Mr. Davis or someone on his behalf continued to send e-mails from

the @cernerinc.com domain to unknowing recipients after the LBDS-ISOL MRI project.[8]

**C.    LBDS forged a contract with Cerner Corporation, so that the contract would contain minimum purchase requirements for the LBDS-ISOL prototype MRI system.**

LBDS's or its members' material alterations to the contract between Chase Medical/Phi

and Cerner Corporation are even more appalling than its use of the @cernerinc.com domain.  On

December 3, 2009, Mr. Hernon e-mailed portions of a so-called "Distribution Agreement"

between Chase Medical/Phi and Cerner Corporation to ISOL.[9]  Mr. Hernon attached only a few

pages from the Distribution Agreement – the first page referencing the subject equipment and

services to be sold by Chase Medical/Phi, the eighth page containing an escrow agreement for

the subject source code, the eleventh page containing the parties' signatures, Schedule 1

identifying the licensed software and equipment to be sold by Chase Medical/Phi, and Schedule

2 setting forth minimum purchase quantities of MRI systems for 2010 through 2012.[10]  ISOL

never saw the entire agreement.[11]

Attached is an affidavit from Cerner Corporation proving that LBDS materially altered

the contract between Cerner Corporation and Chase Medical/Phi in the following manner: (a) the

actual title of the agreement is Value-Added Reseller Agreement (the "VAR Agreement"); (b)

**the title of Section IV is not "Minimum Quantities and Fees," and the VAR Agreement**

---

[6] Exs. B, C, D.
[7] Ex. D.
[8] Ex. D.
[9] LBDS_3473-80, Pl.'s Ex. 131, Ex. E.
[10] Ex. E.
[11] Tr. for Sept. 9, 2013 Depo. of Dr. Lee, Ex. F, at 67:12-21,68:7-15, 73:24-25, 74:1.

**does not contain any provision imposing upon Cerner Corporation a minimum purchase requirement because Cerner Corporation never agreed to make any such commitments**; (c) Section 4.1 was renumbered and modified to reference a Schedule 4; (d) Section 4.4 was deleted; (e) Section 14.4 was deleted; (f) Sections 14.4 to 14.13 were renumbered; (g) Section 14.13 was modified to remove phrases; (h) **Schedule 2 "Minimum Purchase Quantities" was added**; and (i) **Schedule 3 was renumbered and modified to decrease the discount on equipment to fifteen percent**.[12] The "Distribution Agreement" shown to ISOL materially altered the vast majority, if not all, of Cerner Corporation's obligations under the VAR Agreement.

On May 14, 2014, Defendants served Cerner Corporation with a subpoena for a true and correct copy of the VAR Agreement.[13] Pursuant to the subpoena, Cerner Corporation produced a true and correct copy of the VAR Agreement on May 19, 2014.[14] The materials differences between the Distribution Agreement and the VAR Agreement are highlighted in the above-referenced affidavit.[15]

**D.    LBDS manufactured e-mails from a purported venture capital investor, Ansel Capital Partners.**

In 2009 and 2010, Mr. Hernon forwarded purported e-mails from Ansel Capital Partners to ISOL.[16] The underlying e-mails were purportedly from Michael Dreco, the Managing Director of Ansel Capital Partners, who was shown to be forwarding e-mails from a person identified as Dr. Gary Ansel.[17] These e-mails stated that Ansel Capital Partners needed to review the contracts between ISOL and LBDS and to observe a successful demonstration of the LBDS-ISOL MRI system before Ansel Capital Partners would agree to provide LBDS with funds to pay

---

[12] Aff. of Denisa Smith., Ex. G. By decreasing the discount on equipment in Schedule 3, LBDS increased Chase Medical/Phi's profit margin under the Distribution Agreement.
[13] Subpoena, Ex. H.
[14] The VAR Agreement, Ex. CCC; Supp. Aff. of Denisa Smith, Ex. DDD.
[15] *See* Ex. G.
[16] Decl. of James W. Walker, Ex. I.
[17] Ex. I.

ISOL's invoices.[18]  In the final e-mail from Dr. Ansel, he requested that LBDS move the MRI system to a fixed location.[19]  After this e-mail was sent, LBDS asked ISOL to help install the MRI at fixed location in Dallas, Texas.[20]  There were no direct communications between ISOL and Dr. Gary Ansel or Ansel Capital Partners.[21]

The undersigned lead counsel's declaration proves that LBDS or its members manufactured the above-referenced e-mails from Ansel Capital Partners.[22]  Gary M. Ansel, MD, FACC, is an established cardiologist from Columbus, Ohio, who inspected the LBDS-ISOL demonstration MRI system on behalf of the Ohio Health Group, which was apparently only interested in purchasing the demonstration system.[23]  After this initial inspection, Dr. Ansel had no subsequent communications with Chase Medical/Phi, LBDS, or ISOL.[24]  Dr. Ansel did not draft or send any of the underlying e-mails forwarded by Mr. Hernon to ISOL.[25]  Dr. Ansel does not know and has never had any relationship with the individual identified as Michael Dreco of Ansel Capital Partners or with any entity known as Ansel Capital Partners. [26]  If the Court deems it necessary, the undersigned lead counsel will gladly assist the Court in securing Dr. Ansel's testimony in this regard.

---

[18] Ex. I.
[19] Ex. I.
[20] Tr. of Sept. 11, 2013 Depo. of Dr. Lee, Ex. J, at 92:23-93:3.  Upon information and belief, the MRI system is still located at this fixed location – the iHeart Center at 17950 Preston Road, Dallas, Texas 75252.  Mr. Davis is currently the Chairman and Chief Executive Officer of this entity, and Mr. Tayce is the Vice President of Finance. *See* The iHeart Advantage: Our Team, *available at* http://www.iheartcenters.com/about/team/ (last visited May 9, 2014), Ex. K.
[21] Ex. F at 45:14-20, 91:23-25; Ex. J at 43:15-44:21, 46:22-47:23, 89:17-20; Tr. of Sept. 10, 2013 Depo. of Dr. Lee, Ex. M, at 141:6-10.
[22] Ex. I.
[23] Ex. I.
[24] Ex. I.
[25] Ex. I.
[26] Ex. I.

**E.     During this lawsuit, LBDS produced, used, and testified about the substance of these manufactured and forged documents.**

Below is a concise summary of LBDS's egregious, bad-faith conduct during this lawsuit:

1.     On August 16, 2011, LBDS filed the Original Complaint (Doc. No. 1) against ISOL, Dr. Lee, and three additional citizens of the Republic of South Korea, asserting claims for breach of contract, trade secrets misappropriation, civil conspiracy, unfair competition, and theft of trade secrets, seeking injunctive relief, actual damages, and punitive damages.

2.     On March 6, 2012, LBDS filed its Response to Defendants' Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction and in Favor of a More Convenient Forum (Doc. No. 15), arguing, in part, that Defendants failed to prove that LBDS's conspiracy and theft claims could be adjudicated under the laws of the Republic of South Korea.[27]  In support of this response, Mr. Hernon provided sworn testimony that if LBDS were required to litigate its claims in South Korea it would cause significant hardship for LBDS and its members.[28]

3.     On June 7, 2013, LBDS served its initial document production on ISOL.[29] This production included manufactured e-mails from Ansel Capital Partners.[30]  This production also included the e-mail from Mr. Hernon sending isolated pages from the "Distribution Agreement" to ISOL.[31]

4.     On June 14, 2013, LBDS served its first supplemental document production.[32]  This production included manufactured e-mails from Ansel Capital Partners.[33]  This production also included the manufactured e-mail from Bill Gish using the @cernerinc.com domain.[34]

5.     On June 21, 2013, LBDS served its additional disclosures and filed its Notice of Compliance with Discovery Order (Doc. No. 48).  The additional disclosures reiterated that LBDS had produced all relevant documents located to date and provided that LBDS was seeking $68,000,000 in lost profits damages from lost sales of cardiac MRIs for 2010 through 2012.[35]

6.     On July 9, 2013, LBDS served its First Set of Requests for Admission, including a request regarding ISOL's reliance on the minimum purchase quantities under the Distribution Agreement.[36]

---

[27] Pl.'s Resp. (Doc. No. 15) at 17.
[28] Pl.'s Resp. (Doc. No. 15), Hernon Decl. at ¶18.
[29] June 7, 2013 correspondence, Ex. N.
[30] LBDS_2960, Ex. O; LBDS_2961, Ex. P; LBDS_3216, Ex. Q; LBDS_3284, Pl.'s Ex. 80, Ex. R; LBDS_3285-86, Ex. S; LBDS_3287-88, Ex. T; LBDS_3291-92, Ex. U; LBDS_3586, Ex. V; LBDS_3588, Ex. W; LBDS_4086-88, Defs.' Ex. 70, Ex. X; LBDS_4263, Defs.' Ex. 68, Ex. Y.
[31] Ex. E
[32] June 14, 2013 correspondence, Ex. Z.
[33] LBDS_ 5858-59, Ex. AA; LBDS_5901, Ex. BB; LBDS_5902-03, Pl.'s Ex. 55, Ex. CC; LBDS_5981-92, Ex. DD; LBDS_6517, Ex. EE; LBDS_6518, Pl.'s Ex. 150, Ex. FF; LBDS_7881-82, Ex. GG; LBDS_7906, Ex. HH.
[34] LBDS_5998, Pl.'s Ex. 56, Ex. II.
[35] Pl.'s Additional Disclosures, Ex. JJ.
[36] Pl.'s Req. for Admission, Ex. KK.

7.     On July 17, 2013, LBDS served a supplemental production containing the Distribution Agreement.[37]

8.     From September 9, 2013, to September 12, 2013, LBDS used the Ansel Capital Partners and @cernerinc.com e-mails to solicit testimony from ISOL's corporate representatives regarding ISOL's liability, LBDS's damages, and ISOL's counterclaim for unpaid invoices.[38]

9.     On September 12, 2013, immediately before the deposition of LBDS's corporate representative, LBDS produced an outline summarizing the deponent's (Mr. Davis's) anticipated testimony.  The outline contained factual assertions regarding the Distribution Agreement and Ansel Capital Partners.[39]

10.    On September 18, 2013, LBDS filed an additional Notice of Compliance (Doc. No. 63) regarding its obligations under the Court's Discovery Order (Doc. No. 46).[40]

11.    In November 2013, after the undersigned law firm was retained as counsel, Defendants sought leave to depose Mr. Hernon.[41]  LBDS opposed this request, stating that the case was "ready for trial."[42]

12.    In December 2013, LBDS responded to Defendants' Supplemental Motion for Summary Judgment (Doc. No. 85) by arguing that LBDS's alleged lost profits damages ($57,000,000) were foreseeable and reasonably certain because of the Distribution Agreement.[43]  In support of this response, Mr. Davis provided sworn testimony stating that: (a) "ISOL's misappropriation of LBDS's trade secrets made it impossible for LBDS to bring a cardiac MRI to the market"; (b) "[t]he parties understood and agreed that a successful demonstration of the technology in Pittsburgh by ISOL was a condition precedent to payment from LBDS to ISOL"; and (c) "ISOL, however, never successfully demonstrated functioning cardiac MRI technology to LBDS's investor."[44]

13.    On January 9, 2014, LBDS dismissed with prejudice: (a) its claims against the three above-referenced citizens of the Republic of South Korea (after securing their deposition testimony as parties to this lawsuit); and (b) its claims for civil conspiracy and theft of trade secrets against Defendants.[45] No consideration was provided for the dismissal of these claims.

---

[37] July 17, 2013 Corr., Ex. LL; LBDS_8057-73, Pl.'s Ex. 232, Ex. MM.

[38] Ex. F at 44:21-23, 45:14-20, 47:1-3, 47:15-16, 67:12-21, 68:7-15, 73:24-25, 74:1, 91:17-25; Ex. M at 141:6-10, 142:19-23; Ex. J at 43:15-44:21, 46:22-47:23, 68:14-21, 69:2-4, 79:18-22, 86:6-18, 88:20-25, 89:17-20, 92:23-25, 93:1-3, 97:22-25, 98:3-5; Tr. of Sept. 12, 2013 Depo. of Dr. Lee, Ex. NN at 225:10-226:4.

[39] Depo. Ex. 500, Ex. OO.

[40] The Discovery Order provides that all disclosures "shall constitute a certification that, to the best of the signer's knowledge, information and belief, such disclosure is complete and correct as of the time it is made."  The Discovery Order also imposes an ongoing duty of immediate supplementation if a party knows that disclosed information "was either incomplete or incorrect when made, or is no longer complete or true."  The Discovery Order does not excuse non-compliance on a party's failure to completely investigate its case.

[41] Defs.' Mot. to Amend Docket Control Order (Doc. No. 72) at 5.

[42] Pl.'s Sur-Reply (Doc. No. 79) at 3.

[43] Pl.'s Resp. (Doc. No. 86) at 24, 27-28

[44] Pl.'s Resp. (Doc. No. 86) at Ex. HH.

[45] Joint Stip. Of Dismissal (Doc. 95).

14.    On January 17, 2014, LBDS responded to Defendants' motion to exclude the testimony of LBDS's damages expert by defending the expert's reliance on the Distribution Agreement to calculate $57,000,000 in lost profits damages.[46]   In his report, the expert also relied on the @cernerinc.com and Ansel Capital Partners e-mails.[47]

15.    During the February 25, 2014 Pretrial Conference, LBDS suggested that Scott Porter with Cerner Corporation was terminated because Chase Medical/Phi was not able to perform under the Distribution Agreement.[48] In its initial disclosures, LBDS identified Mr. Porter as an "Independent LBDS Consultant."[49]   Attached is an affidavit from Cerner Corporation proving that Mr. Porter voluntarily left Cerner Corporation and was not terminated for cause.[50]

16.    On February 28, 2014, LBDS responded to Defendants' Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction (Doc. No. 147) by arguing that LBDS had standing to assert claims for damages belonging to Chase Medical/Phi under the Distribution Agreement.[51]   In support of this response, Mr. Davis provided sworn testimony authenticating the Distribution Agreement.[52]

17.    On March 5, 2014, during LBDS's opening arguments of the jury trial, LBDS told the jury that it would prove that it suffered at least $25,000,000 in lost profits damages under the Distribution Agreement and that ISOL was not entitled to damages for its counterclaim because there was never a successful demonstration of the parties' MRI technology to investors.[53]

18.    On that same date, Mr. Davis testified regarding ISOL's failure to provide a successful demonstration of the parties' MRI system to Ansel Capital Partners.[54]   LBDS admitted into evidence an e-mail from Ansel Capital Partners in support of Mr. Davis's testimony.[55]   Mr. Davis also provided extensive testimony regarding Cerner Corporation, the minimum purchase quantities under the Distribution Agreement, the expected profits under the Distribution Agreement, ISOL's knowledge of the Distribution Agreement, the winding up of Chase Medical/Phi, and LBDS's standing to assert claims under the Distribution Agreement.[56]   In support of this testimony, LBDS admitted into evidence the Distribution Agreement and Mr. Hernon's e-mail sending portions of the Distribution Agreement to ISOL.[57]

---

[46] Pl.'s Resp. (Doc. No. 114).
[47] Pl.'s Resp. (Doc. No. 114), Ex. A at 21, 24-25.
[48] Tr. of Feb. 25, 2014 Pretrial Conf., Ex. PP, at 6:22-23.
[49] Ex. DDD.
[50] Aff. of Stephanie Roberts, Ex. QQ.
[51] Pl.'s Resp. (Doc. No. 152).
[52] Pl.'s Resp. (Doc. No. 152), Ex. A.
[53] Mar. 5, 2014 A.M. Trans., Ex. RR, at 69:10-70:4, 70:13-15.
[54] Ex. RR at 114:24-116:22; Mar. 5, 2014 P.M. Trans., Ex. SS at 20:12-18.
[55] Ex. R.
[56] Ex. SS, at 5:1-11:13, 14:23-15:25, 17:1-2, 20:12-23:10.
[57] Exs. E, MM.

19.  On the following day, Mr. Hernon proffered nearly identical testimony regarding Ansel Capital Partners and the Distribution Agreement.[58]  LBDS admitted into evidence additional manufactured documents in support of this testimony.[59]   When the undersigned counsel cross-examined Mr. Hernon regarding e-mails showing an ostensible conspiracy between himself, Mr. Davis, and Mr. Reddy to "regain leverage" from ISOL through, in part, purported communications from Ansel Capital Partners, Mr. Hernon denied that there was anything illicit about this plan.[60]

20.  On March 7, 2014, LBDS's damages expert testified extensively about the Distribution Agreement, the e-mail from Mr. Hernon sending portions of the Distribution Agreement to ISOL, and the @cernerinc.com e-mail purportedly from Bill Gish which had been forwarded to ISOL.[61]  Defendants' Renewed Motion for Judgment as a Matter of Law, and Alternatively, Motion for New Trial (Doc. No. 177), fully explains the extent to which the expert relied on the Distribution Agreement.  In sum, without the forged Distribution Agreement, LBDS has no argument to recover lost profits damages.[62]

21.  In response to Defendants' Motion for Judgment as a Matter of Law (Doc. No. 163), LBDS relied on Mr. Davis's testimony to establish LBDS's ownership of Chase Medical/Phi's claims and on the Distribution Agreement and its damages expert's testimony to argue that it was entitled to lost profits damages.[63]

22.  During closing arguments, LBDS remarked on the trial evidence relating to Ansel Capital Partners and the Distribution Agreement.[64]

23.  In response to Defendants' Renewed Motion for Judgment as a Matter of Law, and Alternatively, Motion for New Trial, LBDS relied on the trial evidence relating to Ansel Capital Partners and the Distribution Agreement to argue that it is entitled to lost profits damages.[65]

24.  In support of its Motion for Judgment on the Verdict and for Prejudgment Interest, LBDS also relied on these manufactured and forged documents.[66]

# II.
# Legal Standard

The Federal Rules of Civil Procedure provide limited sanctions, usually monetary, for

violations of those rules.  Rule 11 provides that a court may sanction a party for filing a pleading

---

[58] Mar. 6, 2014 P.M. Trans., Ex. TT at 13:2-15, 24:1-25:6, 29:20-32:15, 33:17-37:13.
[59] Exs. CC, FF, II.
[60] Ex.  TT  at 53:13-63:5;  *see also*  LBDS_5512, Defs.' Ex. 62, Ex. UU; LBDS_5513, Defs.' Ex. 67, Ex. VV; LBDS_7997-98, Ex. WW; Ex. Y.; ISOL_55247-48, Ex. XX; Ex. S; LBDS_7959-62, Defs.' Ex. 86, Ex. YY.
[61] Mar. 7, A.M. Trans., Ex. ZZ, at 74:19-75:5, 76:22-77:9, 78:16-80:23, 85:6-95:24, 103:7-110:18.
[62] *See* Defs.' Renewed JMOL and Mot. New Trial (Doc. No. 177) at 11-16.
[63] Pl.'s Resp. (Doc. No. 166).
[64] Mar. 11, 2014 A.M. Trans., Ex. AAA at 49:18-20, 54:3-9, 90:2-23.
[65] Pl.'s Resp. (Doc. No. 182).
[66] Pl.'s Reply (Doc. No. 196).

that reasonably lacked evidentiary support when filed or was reasonably likely to lack evidentiary support after a subsequent opportunity for investigation. Fed. R. Civ. P. 11(b)(3); *accord Wesolek v. Layton*, No. H-12-3210, 2014 WL 1030176 at *4-5 (S.D. Tex. Mar. 14, 2014) (discussing legal standard for Rule 11 sanctions); *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 568 (N.D. Tex. 2006) (imposing monetary sanctions following dismissal of complaint that was filed "as a gamble that something might come of it."); *Alexander v. State Farm Lloyds*, No. 4:12-cv-490, 2014 WL549389, at *8-11 (S.D. Tex. Feb. 11, 2014) (imposing monetary sanctions following voluntary dismissal with prejudice by party who falsified evidence and used it during trial). Pursuant to Rule 26, a court may sanction a party for making a false discovery disclosure or interposing a discovery request for an improper purpose. Fed. R. Civ. P 26(g); *accord In re Rosenthal*, No. H-04-186, 2008 WL 983702, at *4-5, 9-10 (S.D. Tex. Mar. 28, 2008) (awarding attorneys' fees pursuant to Rule 26 against subpoenaed party who failed to inform his attorney that he deleted responsive discovery). Under Rule 37, a court may sanction a party for failing to comply with a discovery order. Fed. R. Civ. P. 37(b); *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291, 1308 (Fed. Cir. 2009) (affirming the Court's monetary sanctions against party that withheld discoverable materials); *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 898-99 (5th Cir. 1997) (discussing potential Rule 37 sanctions against party who committed perjury by altering tape of secretly recorded conversation). Finally, under Rule 56, a court may sanction a party that submits an affidavit or declaration in bad faith when responding to a summary judgment motion. Fed. R. Civ. P. 56(h).

If these rules do not provide an adequate sanction to remedy and deter bad-faith conduct, a court has the discretion to rely on its inherent power to fashion an appropriate sanction. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *accord Woodson v. Surgitek*, 57 F.3d 1406,

1418 (5th Cir. 1995) ("[G]iven the entirety of the circumstances and the wide range of willful conduct, it was not error for the court to resort solely on its inherent power.").   Such authority derives from the judiciary's rule in protecting and safeguarding the public.   *Chambers*, 501 U.S. at 44 (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).   A court may rely upon this authority to assess attorneys' fees when a party willfully disobeys a court order or when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.   *Id.* at 45-46 (citations omitted); *accord Sipco, LLC v. Amazon.com, Inc.*, No. 2:08-cv-359, 2013 WL 5372335, at *2-3 (E.D. Tex. Sept. 25, 2013) (awarding attorneys' fees, costs, and expenses, against party that filed false declarations in support of motion to set aside default judgment).   A court may also dismiss a matter with prejudice if there is a clear record of contumacious conduct (stubborn resistance to authority) and lesser sanctions would not serve the best interests of justice.   *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011) (quoting *McNeal v. Papasan*, 842 F.2d 787, 792 (5th Cir. 1988); *Sturgeon v. Airborne Freight Corp.*, 778 F.2d 1154, 1159 (5th Cir. 1985)).   Dismissal with prejudice is an appropriate sanction when the bad-faith conduct is solely attributable to the client.   *Id.* at 80 (affirming dismissal with prejudice because of perjury); *accord Johense v. Jani-King, Inc.*, No. 3:06-cv-0533, 2008 WL 631237, at *1-3 (N.D. Tex. Mar. 3, 2008) (dismissing with prejudice because of perjury and citing cases holding that this sanction is especially appropriate where a party falsifies or manufactures evidence).   A court has the authority to make credibility determinations regarding the alleged misconduct. *Howard v. State Farm Lloyds*, No. H-04-0352, 2005 WL 2600442, at *9 (S.D. Tex. Oct. 13, 2005) (citations omitted) (sanctioning party who submitted false documents and sham affidavits in response to summary judgment motion and committed numerous acts of perjury during her depositions).

### III.
### Analysis

LBDS manufactured documents to defraud and manipulate a foreign company and then used those documents as its primary evidence in prosecuting its claims against the same company and its employees. The LBDS principals, Messrs. Davis and Hernon, based their perjurious testimony on these same fraudulent exhibits. Mr. Davis, as the party representative, even went so far as to sit silently at counsel table while LBDS's damages expert testified under oath using these same manufactured documents as the substantial bases for his opinions.  It is difficult to imagine a greater abuse of the civil justice system.

The Court need not parse the Rules to find an appropriate sanction for each discrete occurrence of sanctionable conduct because LBDS's bad-faith conduct was so far-reaching and of such a scale that it tainted every aspect of this lawsuit.  *See Chambers*, 501 U.S. at 50; *Woodson*, 57 F.3d at 1418.  In fact, the Rules do not specifically address LBDS's most egregious occurrences – manufacturing and altering documents to defraud Defendants, designating and using these documents as trial exhibits, committing perjury, providing and allowing its expert to rely upon these documents, and remaining silent while Defendants were prosecuted with these documents.  The Federal Rules of Civil Procedure would only sanction the following bad-faith conduct: (a) knowingly filing pleadings, including the Complaint, based on false information and for improper purposes; (b) knowingly producing manufactured and forged documents during the discovery process while simultaneously certifying compliance with its obligations under the Rules and the Discovery Order; (c) using those manufactured and forged documents to elicit testimony from Defendants' witnesses during the discovery process; and (d) committing perjury when responding to Defendants' Supplemental Motion for Summary Judgment.  *See* Fed. R. Civ. P. 11(b)(3), 26(g), 37(b), 56(h).

The Court should use its inherent authority, and the Rules as might be necessary, to set aside the Verdict, dismiss LBDS's claims with prejudice, and order LBDS to pay Defendants' attorneys' fees incurred in this frivolous lawsuit.[67]   *See Chambers*, 501 U.S. at 44, 50; *Sipco, LLC*, 2013 WL 5372335, at *2-3; *Johense*, 2008 WL 631237, at *1-3.   Given the scope of LBDS's misconduct and the substantial likelihood that LBDS lacks any significant assets, any lesser civil sanction would not be in the interests of justice.   *See Brown*, 664 F.3d at 77, 80.

Dated: May 21, 2014                         Respectfully submitted,


                                            /s/ James W. Walker
                                            James W. Walker  (Lead Attorney)
                                            State Bar No. 20709600
                                            jwalker@coleschotz.com
                                            Justin S. Levy (Attorney to be Noticed)
                                            State Bar No. 24078852
                                            jlevy@coleschotz.com
                                            Edward Kiel (Attorney to be Noticed)
                                            admitted *pro hac vice*
                                            ekiel@coleschotz.com
                                            COLE, SCHOTZ, MEISEL, FORMAN &
                                            LEONARD, P.A.
                                            301 Commerce Street, Suite 1700
                                            Fort Worth, Texas  76102
                                            Telephone:  (817) 810-5250
                                            Facsimile:   (817) 977-5273

                                            **ATTORNEYS FOR DEFENDANTS**

---

[67] Even if the Court declined to sanction LBDS by setting aside the Verdict, dismissing its claims with prejudice, and ordering LBDS to pay Defendants' attorneys' fees, the Court would still have to set aside any judgment entered against Defendants because there is clear and convincing evidence of LBDS's fraud and misconduct.  *See* Fed. R. Civ. P. 60(b)(3); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1346 (5th Cir. 1978).

## CERTIFICATE OF CONFERENCE

The undersigned certifies that I served Plaintiff's lead and local counsel with drafts of ISOL's Emergency Motion for Leave from Stipulated Protective Order to Comply with Subpoena *Duces Tecum* and Emergency Motion for Sanctions by electronic mail on May 14, 2014.  On May 16, 2014, I conferred with an authorized representative of the Akin Gump law firm, who was unable at that time to advise whether Plaintiff was opposed or unopposed to the relief sought in either motion, but who asked that ISOL refrain from filing anything in order to allow Akin Gump an opportunity to confer with their client. For this reason, ISOL refrained from filing both the Emergency Motion for Leave from Stipulated Protective Order to Comply with Subpoena *Duces Tecum* and this Emergency Motion for Sanctions.

As the situation developed, ISOL was informed on the morning of May 20, 2014, that LBDS opposed the relief sought in ISOL's Emergency Motion for Leave from Stipulated Protective Order to Comply with Subpoena *Duces Tecum* and said motion was filed later that same morning.  ISOL was later informed on the evening of May 20, 2014, that Akin Gump would be filing its Motion to Withdraw on May 21, 2014. Despite the twenty-one day safe-harbor period otherwise provided to LBDS under Rule 11, ISOL advised Akin Gump's representative that ISOL would also file its Emergency Motion for Sanctions on May 21, 2014.

The publicity surrounding the $25,000,000 Verdict, the prior financial loss ISOL sustained by virtue of LBDS's refusal to pay the substantial bulk of ISOL's technology services invoices, the general loss of customers to ISOL that were crowded out by the LBDS project, and ISOL's incurrence of the attorneys' fees and costs attendant to this litigation have all combined to create an existential threat to ISOL as a commercial enterprise.  This combination of dire facts leaves ISOL little choice but to file this Emergency Motion for Sanctions in advance of the expiration of the twenty-one day safe harbor period.  In truth, this is likely a moot point given that LBDS will not be able, in only a few weeks' time, to cure or remedy the harm it has caused ISOL by means of a mere pleading amendment.

ISOL presumes that Plaintiff LBDS is opposed to the relief sought in this motion.

/s/ James W. Walker
James W. Walker

## CERTIFICATE OF SERVICE

The undersigned further certifies that all counsel of record who are deemed to have consented to electronic service are being served on this day of May 21, 2014, with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3).

/s/ James W. Walker
James W. Walker