**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **LBDS HOLDING COMPANY, LLC,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CASE NO. 6:11-CV-428** |
| **ISOL TECHNOLOGY INC., MEDIVALLEY INC., AND HEUNG-KYU LEE,** | § § § § | |
| **Defendants.** | § § § | |

**ORDER**

On July 22, 2014, the Court heard oral arguments on Defendants ISOL Technology, Inc.,

Medivalley Inc., and Heung-Kyu Lee's (collectively, "ISOL") Emergency Motion for Sanctions

(Docket No. 199).  This hearing followed a trial in which a jury found ISOL liable for breach of

contract, trade secret misappropriation, and unfair competition, and awarded Plaintiff LBDS

Holding Company, LLC ("LBDS") $25,174,761.  Docket No. 268.  ISOL now argues the verdict

cannot stand because LBDS produced and relied upon fraudulent documents throughout the

litigation and trial.  Docket No. 199 at 1.  ISOL asks the Court to dismiss LBDS's claims with

prejudice and order LBDS to pay ISOL's attorneys' fees.  *Id*.  For the following reasons, the

Motion is **GRANTED**.

**BACKGROUND**

This lawsuit arose from a soured business relationship.  LBDS is a Richardson, Texas

company specializing in cardiac imaging technology for magnetic resonance imaging systems

("MRIs").  LBDS developed a business plan whereby it would retrofit smaller 1.5 Tesla MRI

machines with software and hardware that enables the MRIs to take clinically acceptable cardiac

images.  LBDS saw a business opportunity with this plan as cardiac images from MRIs are generally only possible on the larger 3.0 Tesla MRIs, which are often too large and expensive for smaller hospitals and clinics to purchase.  Because LBDS's expertise was primarily in the software and marketing aspects of this project, LBDS needed to partner with an MRI manufacturer.  Through industry connections, LBDS contacted ISOL, an MRI equipment developer based in South Korea.

In order to secure the business relationship, it was necessary for LBDS to acquire an ownership interest in ISOL in order to reinstate Dr. Heung-Kyu Lee as its CEO.[1]  Docket No. 186, 3/5 AM Tr. at 99:2–105:12.  LBDS and ISOL then entered into a Technology Services and Product Supply Agreement ("TSPS Agreement"), which provides that ISOL would retrofit MRIs with LBDS's proprietary software, and then sell those MRIs back to LBDS, with the intention that LBDS would then resell the MRIs on the open market.  After several years of disappointing results, LBDS became dissatisfied with ISOL when it discovered that ISOL had developed business relationships with LBDS competitors to retrofit MRIs capable of producing cardiac images.

LBDS ended the project and sued for damages, alleging that ISOL failed to satisfy the requisite standard of care and confidentiality provisions of the TSPS Agreement and that ISOL and Dr. Lee were guilty of trade secret misappropriation and unfair competition.  LBDS contended that its trade secrets included compiled code libraries (DLL files), support code for the implementation of the DLL files, cardiac imaging know-how, and the business model of retrofitting 1.5 Tesla MRI systems to perform cardiac imaging.  LBDS sought recovery of (1)

---

[1] Dr. Lee founded ISOL in the late 1990s, but had been ousted from ISOL by management and outside investors. Docket No. 186, 3/5 AM Tr. 113:18–20.  LBDS eventually invested over "half a million dollars" to reinstate Dr. Lee as CEO.  *Id*.

$24,414,068 in lost profits based on a collateral distribution agreement, in which a third-party global MRI supply company, Cerner Corporation, had allegedly agreed to buy 345 MRIs from a LBDS-related entity (the "Cerner Agreement");[2] (2) $760,693 in unjust enrichment damages based on the research and development expenses incurred by LBDS-related third parties;[3] and (3) punitive damages.

ISOL counterclaimed for breach of contract alleging that LBDS failed to pay properly due and owing invoices incurred under the TSPS Agreement, failed to pay existing invoices for a delivered MRI system, and failed to order new MRIs as required under the TSPS Agreement. ISOL sought recovery of $1,835,035 in damages.

Following a six-day trial, the jury returned a verdict with the following findings:

- ISOL breached Article 7.1 of the TSPS Agreement (standard of care provision) and ISOL's breach was not excused,

- ISOL breached Article 11 of the TSPS Agreement (confidentiality provision) and ISOL's breach was not excused,

- ISOL failed to prove LBDS breached the TSPS Agreement,

- ISOL misappropriated LBDS's trade secrets,

- LBDS failed to prove Dr. Lee misappropriated LBDS's trade secrets,

---

[2] The Cerner Agreement that LBDS produced contained a "Minimum Purchase Quantity" requirement, representing that Cerner committed to purchase 345 MRIs. Because the LBDS-ISOL project never produced a working MRI to sell to Cerner, LBDS claimed the lost profits on these unrealized sales. *See* Docket No. 199 at 3–4. Cerner has filed declarations with the Court that this was not the contract it signed with LBDS. The contract it provided was significantly different than the one LBDS produced in this litigation. *See id*. Among other changes, it did not include any "minimum purchase" requirement.

[3] The owners of LBDS developed a complicated corporate scheme to implement this MRI project, forming multiple companies for specific roles. For example, LBDS is a holding company which was formed primarily to work with a MRI manufacturer, in this case ISOL. Other related entities, such as Phi Health; Chase Medical, LP; and CMI Holding Company, Inc. were formed for other functions, such as to interface with medical supply companies and to incur the costs of development. Whether LBDS's owners had proved a chain of title to show LBDS was entitled to the lost profits and unfair competition damages was an issue pending in the post-trial motions, which the Court need not reach in light of its ruling on the instant Motion for Sanctions.

3

- ISOL engaged in unfair competition against LBDS,

- LBDS failed to prove Dr. Lee engaged in unfair competition against LBDS, and

- LBDS sustained damages of $24,414,068.00 in lost profits based on ISOL's breach and $760,693.00 in unjust enrichment from ISOL's trade secret misappropriation and unfair competition.

Docket No. 168.

The Court ordered post-trial briefing and set a date for oral argument. Docket No. 172. Three weeks before the post-trial motions hearing, ISOL filed the instant Motion for Sanctions, alleging that LBDS's case had been based upon fraudulently forged documents, including the Cerner Agreement and the Ansel Capital Partners documents.[4] Docket No. 199. Among other things, ISOL claimed that LBDS also created a fake domain name (cernerinc.com) to masquerade as real and fictitious interested third parties in an effort to inflate the apparent value of LBDS's technology. *Id.* at 1–9. Tellingly, within an hour of ISOL filing the instant Motion for Sanctions, counsel for LBDS, Akin Gump Strauss Hauer & Feld LLP, filed an Unopposed Motion to Withdraw as Attorney (Docket No. 201).

The seriousness of these allegations is underscored by the fact that on February 12, 2015, the United States Attorney for the Western District of Missouri filed a criminal complaint in the U.S. District Court in Kansas City, Missouri, No. 4:15-cr-00077-DGK, charging Albert Davis, LBDS's CEO, with conspiracy to commit wire fraud. According to an affidavit filed in support of the criminal complaint, Davis and his co-conspirators impersonated Cerner employees,

---

[4] LBDS produced emails purportedly from "Ansel Capital Partners," in which Ansel Capital Partners was interested in investing in the LBDS-ISOL venture. *See* Docket No. 199 at 4–5. By all accounts, Ansel Capital Partners is a fictitious company and LBDS members posed as its employees in the email chain. These emails were used to convince ISOL to take responsibility for certain project failures and to convince ISOL to send an MRI to the United States without payment.

physicians, investors and others—both in e-mails and through in-person visits.  The affidavit alleges that Davis and his co-conspirators created a fake Cerner business entity, opened a fake Cerner bank account, registered a fake Cerner Internet domain, created fake Cerner employee e-mail accounts, leased virtual office space for a fake Cerner address in Kansas City and paid for cellphones with local 816 area code phone numbers.  They also allegedly created fake Cerner product quotes and fake Cerner invoices.  These filings indicate that Davis and other members of LBDS worked together as a part of up to 70 individual business entities registered in Texas, Colorado, Nevada, Wyoming, Washington, and Delaware.  These entities often utilize similar names and addresses, but generally maintain separate business registrations and bank accounts. *See* http://www.fbi.gov/kansascity/press-releases/2015/texas-man-charged-in-1-million-fraud-scheme; *see also USA v. Davis*, No. 6:15-cr-7-MHS-JDL (E.D. Tex.).

The Court granted Akin Gump's Unopposed Motion to Withdraw as Attorney, ordered additional briefing from the parties, and reset the post-trial motions hearing, including this Motion for Sanctions, to allow LBDS additional time to obtain new counsel and respond to the Motion for Sanctions.  A hearing on all post-trial motions was held on July 22, 2014.  Docket Nos. 203, 205, 209, and 218.

**APPLICABLE LAW**

*Sanctions*

The Federal Rules of Civil Procedure provide multiple sanction remedies applicable to the facts of this case.  Rule 11 provides that a court may sanction a party for filing a pleading that reasonably lacked evidentiary support when filed or was reasonably likely to lack evidentiary support after a subsequent opportunity for investigation.  FED. R. CIV. P. 11(b)(3); *accord Wesolek v. Layton*, No. H-12-3210, 2014 WL 1030176, at \*4–5 (S.D. Tex. Mar. 14, 2014)

(discussing legal standard for Rule 11 sanctions).  Rule 26 allows a court to sanction a party for making a false discovery disclosure or interposing a discovery request for an improper purpose. FED. R. CIV. P. 26(g); *accord In re Rosenthal*, No. H-04-186, 2008 WL 983702, at *4–5, 9–10 (S.D. Tex. Mar. 28, 2008) (awarding attorneys' fees pursuant to Rule 26 against subpoenaed party who failed to inform his attorney that he deleted responsive discovery).  Under Rule 37, a court may sanction a party for failing to comply with a discovery order.  FED. R. CIV. P. 37(b). Finally, under Rule 56, a court may sanction a party that submits an affidavit or declaration in bad faith when responding to a summary judgment motion.  FED. R. CIV. P. 56(h).

Beyond the Federal Rules of Civil Procedure, a court has inherent power to fashion appropriate sanctions.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 54–55 (1991) (finding no abuse of discretion for the District Court to use its inherent powers, rather than the Rules of Civil Procedure, to tax the entire cost of respondent's attorneys' fees for the fraud petitioner perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation); *Sipco, LLC v. Amazon.com, Inc.*, No. 2:08-cv-359, 2013 WL 5372335, at *2–3 (E.D. Tex. Sept. 25, 2013) (using the Court's inherent power to sanction a party by awarding attorneys' fees, costs, and expenses against a party that filed false declarations).  Such authority derives from the judiciary's role in protecting and safeguarding the public.  *Chambers*, 501 U.S. at 44.

As a part of its inherent power, a court may dismiss a matter with prejudice if there is a clear record of contumacious conduct and lesser sanctions would not serve the best interests of justice.  *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011); *Woodson v. Surgitek*, 57 F.3d 1406, 1418 (5th Cir. 1995) ("[G]iven the entirety of the circumstances and the wide range of willful conduct . . . it was not error for the court to resort solely to its inherent

power [to dismiss plaintiff's claims with prejudice].").   Dismissal with prejudice is an appropriate sanction when the bad-faith conduct is solely attributable to the client.  *Brown*, 664 F.3d at 80 (affirming dismissal with prejudice because of perjury); *accord Johense v. Jani-King, Inc.*, No. 3:06-cv-0533, 2008 WL 631237, at *1–3 (N.D. Tex. Mar. 3, 2008) (dismissing with prejudice because of perjury and citing cases holding that this sanction is especially appropriate where a party falsifies or manufactures evidence).

## ANALYSIS

### *Vacating the Verdict*

LBDS begins its response brief by admitting the fraud it perpetrated on ISOL, the Court, and the jury: "*Plaintiff admits that it produced unauthentic documents in discovery and that it used such documents as evidence at trial to support its damages calculations*."  Docket No. 215 at 1 (emphasis in original).  However, LBDS then argues that the appropriate remedy is for the Court to vacate the jury's verdict only with respect to damages, and that the liability verdict should stand because it was supported by legitimate evidence.  *Id*. at 5–6.  While LBDS admits that producing forged documents is a sanctionable offense, LBDS states that "Defendants cite to no authority in which a court has vacated a jury's findings as a manner of sanctioning a party." *Id*. at 5.

LBDS's argument is unpersuasive.  LBDS admittedly used forged documents to obtain a verdict, but now wants to parse which part of the verdict was tainted by its web of deceit.  While LBDS's dishonest conduct, now the subject of a pending criminal prosecution, relates most directly to its damages claims, its liability claims were inextricably tied to showing that its technology had commercial value with resulting damages.  LBDS should not be allowed to gain the benefit of a liability verdict from a trial that was based on manufactured evidence and

perjured testimony.  Nor should ISOL be forced to bear the stain of the jury's finding of liability, where throughout the trial ISOL was forced to defend itself against a case based on fraud and deceit.[5]  Accordingly, the verdict is **VACATED** in its entirety.

*Dismissal with Prejudice*

Given the extent of LBDS's contumacious conduct, nothing short of dismissal of LBDS's complaint with prejudice would be an appropriate sanction in this case.  Any lessor sanction would disserve the interests of justice.  *See Brown*, 664 F.3d at 77 (affirming dismissal with prejudice because of perjury).  The members of LBDS created fake identities in order to pose as potential customers and capital investors interested in the LBDS-ISOL project.  LBDS created fake email addresses, domain names, and contracts to perpetuate this fraud.  LBDS then sued ISOL, using these same documents as the foundation for the lawsuit.

ISOL may never have even entered into the TSPS Agreement but for LBDS's fraud.  By dishonestly exaggerating the value of the joint project, LBDS convinced ISOL to invest heavily into a project that never materialized.  For the few people that comprise ISOL, this investment represents time and money that they will never be able to recoup.  ISOL was then forced to defend itself in a foreign country, despite the fact that it was the victim of LBDS's coordinated sham.  As its counsel stated at the hearing, ISOL is close to shutting down operations because of these events.  Docket No. 224 at 7:13.

---

[5] LBDS admits the lost profits award of $24,414,068, which was based solely on the forged Cerner Agreement, cannot stand.  Docket No. 168.  But LBDS also used the fake Cerner Agreement and manufactured Ansel Capital Partner documents as evidence that its technology had value as part of its unjust enrichment award of $760,693. Docket No. 190, 3/7 AM Tr. at 77:20–78:14; Docket No. 215 at 4–6.   LBDS offered this fraudulent evidence to show commercial injury through the loss of valuable information in its trade secret misappropriation and unfair competition claims.  PX 166, 3/6 PM Tr. 19:1–21:19, 24:14–25:2, 31:12–32:18; *see also* PX 80, DX 68, DX 70. Finally, LBDS's overarching story—that friends from West Point started a company from scratch and were sabotaged by its business partner ISOL, shortly before selling the technology to a global MRI supply company—was ultimately based on half-truths and tainted all aspects of the jury verdict.

The impact of LBDS's fraud extends beyond ISOL.  LBDS posed as affiliates of the Cerner Corporation and Dr. Ansel, causing damage to their reputations as well.  Then, as part of the lawsuit, LBDS committed fraud on all of the involved lawyers, witnesses, jurors, and the Court.  ISOL's first set of lawyers worked for two years without full compensation in order to defend it against claims based on lies, and ultimately withdrew.  *See* Docket No. 67 (Order Granting ISOL's former attorneys' motion to withdraw in part because ISOL had "not paid, and appear[] unable to pay," for the attorneys' services).  Only four months before trial, ISOL's second set of lawyers, Jim Walker, Edward Kiel, and Justin Levy of Cole Schotz Meisel Forman & Leonard, PA (collectively "Cole Schotz"), accepted this complex case for trial.  In this short amount of time, Cole Schotz had to brief dispositive motions, prepare experts for trial, and file necessary pretrial disclosures.  ISOL's attorneys were able to accomplish so much in such a short period of time because of the general assumption that documents produced in discovery are authentic.  As Mr. Walker noted in the hearing on sanctions, "[I]f I as a trial lawyer have to take every email that is produced in a case -- in this case it was over 24,000 pages of documents -- and I actually have to as part of the discovery process trace that email back to its original source and ask that original source, now, can you please print this again off your server and compare it for me word for word so I can ascertain that someone like Davis, Hernon, and the rest of the members of LBDS haven't altered it so as to gild the lily in their lawsuit, our entire system, in my opinion, will come to a grinding halt."  Docket No. 224 at 11:25–12:9.  The amount of time Cole Schotz invested in preparation was apparent at the trial, where Mr. Walker and Mr. Levy competently and vigorously defended ISOL.

Furthermore, LBDS's own attorneys, Akin Gump, also felt the effect of their client's fraud.  Weeks after achieving what they believed was a legitimate $25 million victory in a

complicated trade secret case, these attorneys discovered the verdict was based on forged documents. Akin Gump reacted swiftly and immediately notified the Court of LBDS's fraud and filed its Notice Pursuant to Texas Disciplinary Rule of Professional Conduct 3.03 and Unopposed Motion to Withdraw. Docket No. 201. There is no evidence that Akin Gump was ever aware that its client had forged the documents used during litigation. LBDS acknowledged that it withheld its fraud from Akin Gump, and Cole Schotz made a special point at the hearing to acknowledge that Akin Gump was not guilty of any wrongdoing.[6] Docket No. 224 8:22–9:16. Akin Gump is but another victim of LBDS's fraudulent conduct.

LBDS's fraud also impacted the Court and the jury. The Court had ruled on dozens of motions and conducted a half-day pretrial hearing followed by a six-day jury trial. Over twenty citizens were empaneled and eight jurors were selected and spent six days away from their jobs and families hearing this case. This was a waste of time, energy, and resources because of LBDS's fraud.

Our system of justice is predicated upon truth. When self-interest gives way to lies, our whole system of justice breaks down and the rule of law suffers. LBDS's conduct in this case is without question the worst this Court has ever seen. To serve the best interests of justice and deter such conduct in the future, the least severe sanction this court can impose is to dismiss LBDS's complaint with prejudice and to award ISOL its attorneys' fees.

*Attorneys' Fees*

In light of LBDS's deceptive relationship with ISOL, this lawsuit should never have been filed in the first place. Accordingly, the Court **AWARDS** ISOL attorneys' fees for having to defend this frivolous lawsuit the amount of $738,706.47. *See Chambers*, 501 U.S. 32, 50, 54–55

---

[6] After Akin Gump withdrew, Sam Johnson of Johnson Law, PLLC appeared on behalf of LBDS. Mr. Johnson was candid to the Court regarding these issues as well, and is likewise commended for representing his client in a difficult situation.

(1991); *Sipco*, No. 2:08-cv-359, 2013 WL 5372335, at *2–3 (E.D. Tex. Sept. 25, 2013).  This is the amount of Cole Schotz's fees and expenses, which as noted above, were incurred only in the four months prior to the trial date.  The Court has reviewed the Cole Schotz's affidavit outlining the fees and expenses and finds it reasonable.  An award of any lesser amount would not serve the interests of justice.  Accordingly, LBDS is **ORDERED** to pay ISOL $738,706.47.

## CONCLUSION

Pursuant to the Rules of Civil Procedure, as well as the Court's inherent power to fashion sanctions, ISOL's Motion for Sanctions (Docket No. 199) is **GRANTED**.  The verdict is **VACATED**, LBDS's complaint is **DISMISSED WITH PREJUDICE**, and ISOL is **AWARDED** its attorneys' fees in the amount of **$738,706.47**.

**So ORDERED and SIGNED this 15th day of May, 2015.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**